IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 22, 2008 Session

**AUTUMN LAINE McDANIEL**
**v.**
**KEVIN EUGENE McDANIEL**

**Appeal from the General Sessions Court for McNairy County**
**No. 7741      Van McMahan, Judge**

**No. W2007-01587-COA-R3-CV - Filed December 18, 2008**

This is a divorce case. The parties were married in 2004, had one child in early 2005, and separated in late 2005. The wife filed a complaint for divorce soon after, and the husband counterclaimed for divorce. During the separation, the wife was the primary residential parent. The wife took various prescription medicines for several conditions, and had previously been addicted to pain medication. At the time of trial, the husband was cohabiting with a young woman whom he began dating when she was seventeen years old. During a substantial portion of the husband's scheduled parenting time, the parties' minor child was in the care of either the husband's parents or the husband's paramour. At trial, the wife testified as to the amount of her annual income, but proffered no documentary proof or other evidence. The trial court designated the wife as the primary residential parent, reduced the husband's residential parenting time, and used the amount of income to which the wife testified to set the husband's child support obligation. The husband appeals. He argues that the trial court erred in designating the wife as the primary residential parent, in reducing his residential parenting time, and in failing to impute to the wife the income level set forth in the child support guidelines. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and WALTER C. KURTZ, SP. J., joined.

C. Timothy Crocker, Daniel E. King, and Michael A. Carter, Milan, Tennessee, for the appellant Kevin Eugene McDaniel

Ryan B. Feeney, Selmer, Tennessee, for the appellee Autumn Laine McDaniel

**OPINION**

This appeal involves a short-lived marriage. Plaintiff/Appellee Autumn Laine McDaniel ("Wife") and Defendant/Appellant Kevin Eugene McDaniel ("Husband") were married on May 28, 2004. This was Husband's first marriage, and Wife's second. At the time they married, Husband was 22 years old and Wife was 21 years old. The parties had one child together, Meagan, born on February 17, 2005.

Wife and her sister are the co-owners of the Yellow Song Salon in Selmer, Tennessee. Wife works at the salon as a hair stylist. Husband is a supervisor at a manufacturing company in Jackson, Tennessee.

After a short and turbulent marriage, the parties separated in October 2005. On November 8, 2005, Wife filed her complaint for divorce with the McNairy County General Sessions Court. On the same date, the General Sessions Court entered a temporary parenting plan order, designating Wife as the primary residential parent and requiring Husband to pay child support in the amount of $544 per month. The temporary parenting plan prohibited either party from allowing a paramour to stay overnight while spending residential parenting time with the child.

Husband filed an answer and counterclaimed for divorce. He sought, among other things, to be designated as the primary residential parent for the parties' child. The parties later entered into an agreed temporary parenting plan, under which Wife remained the primary residential parent and Husband's child support was reduced to $412 per month. The order continued to enjoin both parties from having a paramour spend the night with the child present.

During the parties' separation, both embarked on new relationships. Wife began dating a friend she knew in high school, whom she knew had used illegal drugs in the past. During the relationship, the friend was involved in an automobile accident that resulted in his arrest for driving under the influence and for possession of marijuana.

In April 2006, Husband began a relationship with a young woman he met at a restaurant, Kayla Kennamore. When they met, Kennamore was seventeen years old.

The trial in General Sessions Court was held on January 15, 2007. By the time of trial, Husband was 25 years old and Wife was 24 years old. Wife was living with their child in her parents' home. Husband lived with his parents for a time during the parties' separation, but by the time of trial, he had moved back into the marital home.

Wife testified at the outset of the trial. As a co-owner of the Selmer hair salon, and in her work there as a hair stylist, she said that she paid herself a yearly salary of "approximately $15,000." At the time of the trial, Wife was also working part-time at a store in Jackson, but did not plan to keep the position for very long. She had no pay stubs, personal income tax returns, or other documents to corroborate her testimony on her income. Wife said that she hoped to take online courses towards a bachelor's degree in fine arts.

Wife described an altercation that prompted the parties' separation. She testified, "[Husband] was intoxicated and I wanted to go to sleep and he wanted to have sexual intercourse and I wouldn't, so he – we got into an argument and he threw me to the floor."

Wife then testified about her use of prescription medications. She said that she was taking Seroquel to treat her bipolar disorder. She was also taking Lomotil as an anti-seizure and an anti-depressant, and to treat her migraine headaches. Wife stated that she had previously taken Hydrocodone regularly for TMJ and migraine headaches, but said that she had not taken Hydrocodone for almost two years. She admitted that she sometimes drank alcohol while taking her prescription medications. She also conceded that, in the past, she had been addicted to Hydrocodone and had purchased it "on the street." Wife also admitted dating her high school friend with substance abuse problems, but said that she was no longer dating him.

Regarding the parties' parenting, Wife testified that, when the parties were living together, she was their daughter's primary caretaker. She said, "He didn't change diapers. He didn't get up in the middle of the night. It was me or my mother. . . . He didn't prepare bottles, he didn't wash her clothes, he didn't give her a bath." After the parties' separation, Wife asserted, Husband's parents were the child's primary caretakers during Husband's scheduled parenting times. She said that Husband's mother regularly was the one who picked Meagan up for Husband's scheduled times, and that she kept the child at her house.

After Wife testified, the trial court heard testimony from Husband's girlfriend, Kayla Kennamore. Kennamore said that she met Husband while she was working at a Sonic restaurant when she was only seventeen years old. She said that she informed Husband at the time that she was seventeen, but that they nevertheless started dating. She added, however, that they did not have sexual intercourse until she turned eighteen. She testified that, at the time of trial, she was living with Husband in the former marital home. She conceded that this included the periods of time in which Meagan was spending residential parenting time with Husband, and that she sometimes took care of the baby by herself.

Husband testified next. Husband gave his version of the altercation that Wife described as prompting their separation:

Q (by Wife's counsel): Tell me specific information about the altercation.
A (by Husband): We had went out to eat that night at Logan's and we both had had a drink and come back home and she went to bed, and I wanted to have sex and she didn't. We got in an altercation about that.
Q: Well, what happened?
A: We just started arguing and she—I thought at the time—I though it was diet pills she was taking because she was taking so much medication I didn't know what was wrong with her.
Q: So you blamed it on the medication?
A: Yes, ma'am.
Q: So did you force yourself upon her?
A: No, ma'am.

-3-

Q: Did you push her down?
A: No, ma'am.

Husband said that they had fought before, on an occasion when Wife threatened to leave him and take Meagan with her. When she threatened to leave, Husband asserted, he grabbed her keys to prevent her from leaving, and Wife then threatened to have him killed.

At the time of trial, Husband said, he was working as a supervisor at a manufacturing company, earning $16.31 per hour. During the parties' marriage, he worked night shifts. By the time of trial, he was working the 8:00 a.m. to 4:00 p.m. shift, plus some overtime.

Under the temporary parenting plan in effect at the time of the trial, Husband said that he had residential parenting time with Meagan every other weekend from 10:00 a.m. on Friday until 10:00 a.m. on Monday. He agreed with Wife's testimony that his parents regularly picked Meagan up on Fridays. On a normal weekend, he said, Meagan would stay with him on Friday and Saturday nights, and she would stay with his parents on Sunday nights because he had to be at work on Monday morning at 8:00 a.m. Husband conceded that Meagan had also spent some Friday nights with his parents because he worked "quite a few" Saturday mornings. Husband admitted that his cohabitation with Kennamore during his residential parenting time with Meagan violated the parenting plan. He said that he had been living in violation of the parenting plan in this way for about seven months.

Husband also testified about a bank account that was in dispute:
Q (by Wife's counsel): Did you and Ms. McDaniel have a bank account together when y'all separated?
A (by Husband): Yes, ma'am.
Q: Do you remember how much was in that bank account?
A: No, ma'am.
. . .
Q: How much was in the bank account?
A: I think there was 40 something hundred in savings.
Q: What happened to that money?
A: Got an attorney.
Q: You drew it out; didn't you?
A: Yes, ma'am.
Q: You spent all of it, didn't you?
A: Yes, ma'am.
Q: Was that money accumulated during the marriage?
A: Well, it—I had sold a truck that I had paid for.
Q: Was the account in both of your names?
A: I can't remember.
Q: You said it was a savings account. Did you have a savings account just in your name or was it opened after you and Ms. McDaniel married?
A: I don't remember.

Thus, Husband testified that an unspecified portion of the proceeds in the account came from the sale of his truck. Initially, Husband said that he could not recall whether he and Wife were both named on the account, or when the account had been opened. He later said that the account had held approximately $4,700 before he used the money to retain an attorney.

After the close of the evidence, the General Sessions Court entered a final decree of divorce. It awarded a divorce to both parties on the grounds of abuse and adultery. To determine the primary residential parent for Meagan, the trial court performed a comparative fitness analysis, using the framework provided by the factors enumerated at Tennessee Code Annotated § 36-6-106(a). The trial court explained its reasoning:

> 1) while the court finds both parents to be good, loving, and nurturing parents, the testimony established that the mother has been the primary care giver of the minor child. The court also notes that the paternal grandparents have been the primary care givers while the minor child has been in the custody of the father; 2) the minor child, whom is only two years of age, has lived primarily with her mother since birth. The minor child knows her mother's home to be her home and to move her from this environment at this point in her life would be detrimental to the minor child; 3) the fact that the father is living in an unmarried relationship with an eighteen year old young woman weighs heavily in favor of the mother. Based upon the testimony, when the father is working, either his mother or the eighteen year old live in girlfriend would care for the minor child. While the grandmother would be a very good and suitable care taker for the minor child, the court finds that the eighteen year old live in girlfriend would not make the most suitable care giver. The father's willingness to continue in that unmarried relationship while the custody litigation is pending indicates to the court that he is not considering the best interest of his minor child; and 4) the court is aware that Tennessee Law does not follow the tender years presumption, but it nevertheless does allow the court to consider this as a factor in determining comparative fitness. The court finds in this particular case that the minor child, two years of age, is better served by a bonding relationship with her mother.
>
> The court is mindful of the allegations brought by the father concerning the mother's prior drug dependency. Father alleged that the mother became addicted to Hydrocodone after taking the drug for TMJ and headaches in 2002 through 2005. However, the testimony failed to establish that the mother has been dependant upon any drug since approximately two years ago. Both parties have presented this court with negative hair follicle drug screens within the past month. The court does not consider the mother's drug addiction prior to the minor child's birth relevant enough to outweigh the points mentioned in favor of the mother. The mother's testimony appeared credible to the court and the court does not consider her past drug addiction to be a factor in her present ability to care for her child.

Thus, the trial court found it significant that Husband's parents were in essence the child's primary caregivers during Husband's residential parenting time. The continued relationship with the young live-in girlfriend indicated to the trial court that the child's best interests were not uppermost in

Husband's mind. It found that Wife's past addiction issues were no longer a problem. Based on these findings, Wife was designated as the primary residential parent, and Husband was granted alternate residential parenting time with Meagan every other Friday from 6:00 p.m. until Sunday at 6:00 p.m., and every Wednesday from 5:00 p.m. until school begins on Thursday, or until 8:00 a.m. when school is not in session.

The trial court then addressed Husband's child support obligation. Using $15,000 as Wife's gross yearly income ($1,250 per month), the trial court ordered the parties to prepare a child support worksheet. Based on the worksheet presented, Husband was required to pay $464 per month in child support.

Finally, the trial court divided and distributed the parties' marital property. It awarded the parties $2,000 each, apparently implicitly finding that $4,000 of the monies in the savings account that Husband used to pay his attorney's fees consisted of marital property.

Husband now appeals the court's divorce decree, raising three issues for review. First, he argues that the court erred in designating Wife as the primary residential parent, and in the alternative, that the trial court erred in reducing his scheduled parenting time. He also argues that the trial court miscalculated his child support obligation by failing to impute to Wife an income greater than $15,000 per year. Finally, Husband maintains that the trial court erred in awarding Wife $2,000 as half of the value of the parties' savings account.

In a bench trial, our standard of review for the trial court's findings of fact is *de novo* on the record with a presumption of the correctness of the finding, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); ***Bah v. Bah***, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). The standard of review for the trial court's determination of the credibility of the witnesses is considerably higher. When "the trial court has seen the witnesses and heard the testimony, especially where issues of credibility and the weight of testimony are involved, the appellate court must extend considerable deference to the trial court's factual findings." ***Richards v. Liberty Mut. Ins. Co.***, 70 S.W.3d 729, 732 (Tenn. 2002) (citation omitted); ***see also Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted).

The trial court has broad discretion when making decisions regarding the designation of the primary residential parent and the determination of a parent's residential parenting time. ***See Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citation omitted). The best interest of the child is the most important concern in such cases, ***see Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); T.C.A. § 36-6-106 (2005 & Supp. 2008), and the determination of a child's best interest turns on the particular facts of each case. ***See Taylor v. Taylor***, 849 S.W.2d 319, 326 (Tenn. 1993); ***In re Parsons***, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995) (citation omitted). Therefore, "[i]t is not the function of appellate courts to tweak a [parenting plan] in the hopes of achieving a more reasonable result than the trial court." ***Eldridge***, 42 S.W.3d at 88.

The division of marital property in divorce cases is governed by Tennessee Code Annotated § 36-4-121, which generally provides that the trial court is to divide the property equitably without

regard to fault.[1]  The trial court has substantial discretion when dividing the marital property, and its distribution will be given "great weight" on appeal.  ***See Ford v. Ford***, 952 S.W.2d 824, 825 (Tenn. Ct. App. 1996).  Accordingly, its division of the marital estate is presumed to be correct unless the evidence preponderates otherwise.  ***Lancaster v. Lancaster***, 671 S.W.2d 501, 502 (Tenn. Ct. App. 1984) (citation omitted); Tenn. R. App. P. 13(d).

When the trial court must designate the primary residential parent for a minor child, it is required to make the determination "on the basis of the best interest of the child."  T.C.A. § 36-6-106(a) (2005 & Supp. 2008).  Factors to be considered by the trial court are set out in section 36-6-106(a)(1) through (10).[2]

---

[1] Tennessee Code Annotated § 36-4-121(a)(1) reads in pertinent part:

> Distribution of marital property. – (a)(1) In all actions for divorce or legal separation, the court having jurisdiction thereof may, upon request of either party, and prior to any determination as to whether it is appropriate to order the support and maintenance of one (1) party by the other, equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just.

T.C.A. § 36-4-121(a)(1) (2005).

[2] Section 106 provides:

The court shall consider all relevant factors, including the following, where applicable:
> (1) The love, affection and emotional ties existing between the parents or caregivers and child;
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;
> (4) The stability of the family unit of the parents or caregivers;
> (5) The mental and physical health of the parents or caregivers;
> (6) The home, school and community record of the child;
> ...
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse . . . . or child sexual abuse . . . against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred.  The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence.  In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;
> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
> (10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate

(continued...)

Tennessee courts use a "comparative fitness" approach to making the determination of primary residential parent. *Bah*, 668 S.W.2d at 666. "There are literally thousands of things that must be taken into consideration in the lives of young children, and these factors must be reviewed on a comparative approach." *Id.* (internal citation omitted). Using this approach, the court analyzes the relevant factors as to both parties to determine which parent is comparatively more fit to be the child's primary residential parent.

Husband insists on appeal that the trial court did not give enough weight to the evidence of Wife's past drug use and her association with other drug users, such as the high school friend she dated during the parties' separation. Husband testified, in general, that Wife continued to suffer from drug addiction; Wife testified to the contrary. The trial court found that Wife was not engaging in substance abuse at the time of trial, and that her past drug addiction problems were not a factor in her ability to care for the parties' child. With little documentary or other evidence with which either party's testimony could be corroborated, the resolution of the factual issue of Wife's drug addiction turned on the trial court's determination of the parties' credibility. In such a situation, the trial court is in a better position to resolve the issue because the trial judge is able to observe the witnesses and their demeanor. *Wells*, 9 S.W.3d at 783. We afford great deference to the trial court's decision to credit Wife's testimony about her past drug use and her assertion that she was no longer engaging in substance abuse. *Richards*, 70 S.W.3d at 732.

Husband contends, nevertheless, that the trial court erred in designating Wife as the primary residential parent, so we review the evidence in the record. The evidence indicates that, for most of Meagan's life, Wife has been her primary caretaker. From the testimony of both Husband and Wife, it is clear that, during Husband's residential parenting time with Meagan, she has spent substantial time under the supervision of either Husband's parents or Husband's eighteen-year-old paramour. Moreover, Husband's decision to have his girlfriend live with him during his residential parenting time with Meagan, thereby flouting the prohibition in the court-ordered parenting plan, makes it evident that, to Husband, Meagan's best interest is not his top priority. We agree with the trial court's finding that Meagan's best interests are served by designating Wife as the primary residential parent.

In the alternative, Husband contends that his residential parenting time should not have been reduced. The temporary parenting plan in effect at the time of trial gave Husband residential parenting time every other week from 10:00 a.m. on Friday until 10:00 a.m. on Monday, as well as each week from 10:00 a.m. on Wednesday until 8:30 a.m. on Thursday. In the final divorce decree, the permanent parenting plan gave Husband residential parenting time every other week from 6:00 p.m. on Friday until 6:00 p.m. on Sunday, and every Wednesday from 5:00 p.m. until school begins on Thursday, or until 8:00 a.m. when school is not in session. The evidence showed, however, that Meagan's residential parenting time with Husband was most often spent with Husband's parents or

---

[2](...continued)
and encourage a close and continuing parent-child relationship between the child and the both of the child's parents, consistent with the best interest of the child.

T.C.A. § 36-6-106(a)(1)–(10) (2005 & Supp. 2008).

his girlfriend, rather than with her father. While Husband can certainly share his parenting time with third parties such as grandparents, the child's time with her other parent, Wife, should not be diminished in favor of time with such third parties rather than her father. We find no error in the trial court's schedule for Husband's alternate residential parenting time.

Husband next argues that his child support obligation was incorrectly determined. The trial court found that Wife's yearly income was $15,000, and used this figure to set Husband's child support obligation. The only evidence on the amount of Wife's annual income was her testimony, which the trial court apparently credited. Husband asserts that this was error.

Child support decisions are reviewed on appeal for an abuse of discretion. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). The trial court's discretion should be exercised "within the strictures of the Child Support Guidelines." *Id.* (citations omitted). The discretion of the trial court is abused if it "applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Id.* (citations omitted).

Upon the dissolution of a marriage, the statutes provide for the trial court to "make an order and decree for the suitable support and maintenance of the children." T.C.A. § 36-5-101(a)(1) (2005 & Supp. 2008). In setting child support, the trial court is required to apply the Child Support Guidelines ("Guidelines") as a rebuttable presumption. *Id.* § 36-5-101(e)(1)(A). The Guidelines indicate that imputing gross income to a parent may be appropriate if "there is no reliable evidence of income." TENN. COMP. R. & REGS. 1240-2-4-.04(3)(a)(2)(i)(II) (2006). They further provide a designated amount of imputed income:

> I. If a parent fails to produce reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining current ability to support . . .); and
> II. The tribunal has no reliable evidence of the parent's income or income potential;
> III. Then, in such cases, gross income for the current and prior years shall be determined by imputing annual gross income of . . . [$26,989] for female parents.

*Id.* at 1240-2-4-.04(3)(a)(2)(iv)(I). Thus, Husband argues that Wife's testimony about her income was not reliable, and that, under the Guidelines, the trial court should have imputed income to her in the amount of $26,989.

The Child Support Guidelines parenthetically lists tax returns and check stubs as examples of "reliable evidence of income." They do not, however, indicate that such documents are the only reliable forms of evidence. Husband argues that Wife's testimony is unreliable. Nonetheless, he proffered no evidence to dispute Wife's assertion on her income, such as evidence of a lifestyle that would correlate with a higher income level. Clearly Wife's proof on her income was thin at best. However, the trial court implicitly found her testimony to be credible and "reliable evidence of [her] income." Under the circumstances of this case, we cannot conclude that this implicit finding was in error. Therefore, we find no abuse of discretion in the trial court's decision on the amount of Husband's child support obligation.

Finally, Husband argues that the trial court erred in awarding Wife $2,000 as half of the monies in the parties' savings account at the time of their separation. Husband does not challenge the trial court's implicit finding with regard to the value of the account, but he asserts that the monies in it were the proceeds from the sale of a truck that was his separate property. Accordingly, he argues that the savings account remained his separate property. Because the trial court's classification of property as either marital or separate is "inherently factual," we review the lower court's finding *de novo* with a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *Church v. Church*, No. M2004-02702-COA-R3-CV, 2006 WL 2168271, at *5 (Tenn. Ct. App. Aug. 1, 2006). Marital property includes:

> all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, . . . and valued as of a date as near as reasonably possible to the final divorce hearing date.

T.C.A. § 36-4-121(b)(1)(A) (2005). Separate property includes "[p]roperty acquired in exchange for property acquired before the marriage." *Id.* § 36-4-121(b)(2)(B).

On appeal, Wife concedes that a portion of the amount in the account was proceeds from the sale of the truck, but notes that there was no proof that the entire account consisted of such funds. In Husband's testimony, he asserted that an unspecified amount of funds came from the sale of a truck. He also testified that he could not remember whose name was on the account. Moreover, there was no proof, by testimony or otherwise, from which the trial court could have determined the amount of the proceeds from selling the truck. Under these circumstances, we find that the evidence in the record does not preponderate against the trial court's implicit finding that most of the monies in the savings account should be deemed marital property, and the resulting award to Wife of $2,000.

The decision of the trial court is affirmed. Costs on appeal are taxed to Appellant Kevin Eugene McDaniel, and his surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE